**Howard Paul GUIDRY, Appellant,**

v.

**The STATE of Texas.**

**No. 72775.**

Court of Criminal Appeals of Texas.

Dec. 15, 1999.

Rehearing Denied Feb. 9, 2000.

138

Frances M. Northcutt, Houston, for appellant.

Keli Pool Roper, Assist. DA, Houston, Matthew Paul, State's Atty., Austin, for the State.

## *O P I N I O N*

MEYERS, J., delivered the opinion of the Court, joined by MANSFIELD, PRICE, WOMACK, and KEASLER, J.J.

Appellant was convicted of capital murder. Tex. Penal Code Ann. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Article 37.071 § 2(h). Appellant raises twenty-three points of error. We affirm.

In his first point of error, appellant claims the visiting judge trying the case, Judge Robert Burdette, had no authority to conduct the proceedings because his order of assignment began after the trial was in progress. Appellant also argues, in his second point of error, the evidence was insufficient to support his conviction be-

1. Unless otherwise indicated all future references to Articles refer to the Texas Code of Criminal Procedure.

cause there was no evidence of guilt presented after the effective date of the allegedly untimely assignment.

▇▇ Appellant relies on an order of assignment inadvertently included in the record, assigning Judge Burdette to preside in the 262nd District Court of Harris County, Texas, (appellant was tried in the 230th District Court of Harris County, Texas) beginning Monday, March 31, 1997, for a period of one week. The State has since provided the proper order of assignment in the supplemental clerk's record. Under the proper order, Judge Burdette was assigned to preside in the 230th District Court of Harris County, Texas, for a period of six weeks beginning Monday, February 17, 1997, and ending Friday, March 28, 1997. Pretrial motions were heard on February 19, 1997, and the trial concluded with the entry of the judgment on March 26, 1997. As each of these dates fell within the six week term beginning February 17, 1997, the order of assignment was timely. Appellant's first and second points of error are overruled.

In his third point of error, appellant claims he was denied effective assistance of counsel due to his trial counsel's failure to object to remarks made by the trial judge during voir dire, allegedly authorizing the jury to discriminate against appellant on account of his gender when deliberating on the mitigation special issue. Specifically, appellant points to the following three statements as objectionable: [2]

**2.** Appellant also complains of a fourth statement, but none of the veniremembers present at the time of that statement served as a juror in the case.

**3.** The trial judge preceded the above remarks with the following comments, respectively:
When we talk about mitigating evidence, something that's mitigating, the law does not permit me to define that term for you. Because what might be mitigating to one of you, might not be to another. And what might be to two of you, might not be to two others. . . .
. . . and the word mitigating, I can't define it for you. The law doesn't let me because

[Trial Judge:] Sometimes people think gender is a mitigating circumstance. Sometimes people don't.

[Trial Judge:] Sometimes people think gender is a mitigating circumstance. Sometimes others don't. We've got 450 people on death row, half a dozen are female. Someone thinks gender is a mitigating circumstance.

[Trial Judge:] Sometimes people think gender is a mitigating circumstance. Got 450 people on death row. Six of them are females. Obviously, gender makes a difference somewhere, to somebody. Whether it does or doesn't in a particular case, that's up to the jury.

The trial judge preceded these remarks by telling the prospective jurors that he could not identify for them what he believed to be mitigating circumstances. He explained that it was a term, the meaning of which they would each have to decide for themselves, and further that what might be mitigating in one's person's view, might not be mitigating in the view of another person.[3]

Similar comments were addressed recently in *Fuentes v. State,* 991 S.W.2d 267 (Tex.Crim.App.1999), *petition for cert. filed* (U.S. July 23, 1999), where the trial court explained that mitigation was a personal, well reasoned, moral response to the evidence and offered as an example, that "some people may or may not find youth to be mitigating." He also stated, "Lots of times some folks might think that in some

what might be mitigating to me might not be to you. What might be mitigating to two of you, might not be mitigating to two others. And everybody might have an entirely different view as to what was or was not mitigating in a particular case. If there was anything mitigating at all in the first place.
What is a mitigating circumstance? I can't tell you. Because what one might be to me, it might not be to you. What it might be to you, it might not be to two more of you. . . . So, you decide what's mitigating and you decide how much weight you want to give to it.

cases youthfulness might be a mitigating circumstance; others might not. Some folks might in some cases think that gender might be a mitigating circumstance." We held such comments did not violate the defendant's right to equal protection:

> These comments did not authorize the jury to consider gender a mitigating circumstance. The court was careful to emphasize that these were *examples* of personal responses to the evidence and not defined categories.... Even if, by its comments, the court authorized the jury to consider gender as a mitigating factor, it did not identify which gender would be considered mitigating and did not suggest that the other gender should be considered an aggravating factor.

*Id.* at 275–76 (emphasis in original).

 In an effort to provide venire-members with an understanding of the mitigation special issue, the trial judge in the instant case pointed to examples of evidence that had possibly been viewed as mitigating by other jurors, such as mental retardation, age, youth, and gender. The trial judge did not tell the venirepersons that gender could or should be relied on as a mitigating factor, but stated that it *possibly had been* relied on as a factor. Even if these comments could be construed as authorizing the jury to consider female gender as a mitigating factor, they do not suggest that male gender could or should be considered an *aggravating* factor. Thus, the trial judge's comments were not objectionable, and appellant's trial counsel

did not fall below the standard of reasonable competency by not objecting.[4] Appellant's third point of error is overruled.

In his fourth point of error, appellant complains of the trial court's failure to specifically address, in its findings of fact and conclusions of law concerning the voluntariness of appellant's confessions, certain conflicts in the evidence. Appellant seeks to have this appeal abated for the entry of additional findings in this regard.

Appellant points to the following inconsistencies in the evidence:

(1) whether appellant was questioned about an aggravated robbery charge that was already pending and for which he had already been appointed a lawyer at the time of the officers' interrogation concerning the [instant offense];

(2) whether appellant asked to speak with his lawyer from the aggravated robbery case during the interview;

(3) whether the officers told appellant they had contacted his attorney from the robbery case and that the attorney had given the officers permission to interview appellant about the [instant offense];

(4) whether one of the detectives on the case told Bob Scott, one of appellant's trial attorneys, that he had contacted appellant's attorney from the robbery case and that attorney had given the officers permission to interview appellant about the [instant offense];[5] and,

---

**4.** In order to prove an ineffective assistance of counsel claim, a defendant must establish that (1) counsel's performance fell below the standards of reasonable competency, and (2) there is a reasonable probability that the deficient performance prejudiced his defense thus depriving him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1986).

**5.** During the hearing on appellant's motion to suppress, appellant testified he told the interrogating officers, Detectives Roberts and Hoffman, that he would like to talk to his lawyer, Layton Duer, who had been appointed to represent him in an unrelated robbery

case. He stated that Hoffman had told him that he had contacted Duer and received Duer's permission to talk with appellant about the instant case. Appellant claims this news of permission from Duer was the "main thing that made him decide to go ahead and give the officers a confession." Roberts and Hoffman both testified that appellant never requested, during their interrogation of him, to talk to his lawyer. A local attorney, Deborah Gottlieb, testified that she was in the trial court's chambers when she overheard Roberts and Hoffman talking about having contacted appellant's lawyer on the robbery case and receiving his permission to talk to appellant before interviewing him in connection

(5) whether any of the officers made any promises to appellant to induce him to make statements.

When a question is raised as to the voluntariness of a statement of an accused, the trial court is required to make an independent finding, out of the presence of the jury, as to whether the statement was made under voluntary conditions. TEX.CODE CRIM. PROC. art. 38.22 § 6. If the statement is determined to have been voluntarily made, the court is further required to "enter an order stating its conclusion as to whether or not the statement was voluntarily made, along with the specific finding of facts upon which the conclusion was based." *Id.* The findings must be sufficiently detailed to enable the appellate court to determine the basis for the trial court's ruling and to assist the appellate court "in determining the sufficiency of the evidence to support whatever unstated findings of fact were made by the fact finder." *Hester v. State*, 535 S.W.2d 354, 356 (Tex.Crim.App.1976). Nothing in section six requires the trial court to make specific findings about why conflicting testimony *does not* render the defendant's statement *involuntary.* Rather, the trial court need only state in its findings the reasons for its conclusion that the statement *was voluntary.*

The trial court's "Findings of Fact and Conclusions of Law" are eight pages in length and consist of seven sections. The first five sections generally set out the testimony of various witnesses at the suppression hearing. In Section VI, the trial court rendered its "Findings of Fact"

which include findings that appellant was informed five times of his rights in compliance with article 38.22, that appellant stated unequivocally that he understood what his rights were, that at no time did he ask to remain silent or have an attorney present, that appellant intelligently and knowingly waived his rights, and that no force, threats or promises were made to induce appellant's confession. In Section VII, the trial court made certain "conclusions of law" that are virtually the same as the findings of fact set out in the previous section.

The trial court's findings of law and fact address all of the *issues* raised in connection with the alleged conflicts in the evidence—the first two items identified by appellant concern the invocation of appellant's Fifth and Sixth Amendment rights to counsel, the third and fourth items pertain to alleged deception on the part of the State in obtaining appellant's confession, and the fifth item pertains to alleged promises made by the State in inducing appellant's confession. Moreover, testimony pertaining to all but one of the alleged inconsistencies is discussed or mentioned in the first five sections of the trial court's Findings. While the trial court did not acknowledge or set out *conflicts* or *inconsistencies* in the testimony regarding these issues, the State's testimony concerning the facts surrounding these matters is discussed.[6] As stated previously, the trial court is required to set forth the facts which *support* its conclusions, but need not outline the testimony which *does not support* its conclusions.

with the instant case. Two of appellant's prior lawyers, Sylvia Yarborough and Robert Scott, also testified to being present in the court's chambers and overhearing Roberts say he had contacted appellant's lawyer in the robbery case and was given permission to talk to appellant. Appellant's lawyer in the robbery case, Layton Duer, testified that he was never contacted by law enforcement about whether they could talk to appellant. Roberts testified that he did not contact Duer to ask permission to talk to appellant about the instant offense.

6. For example, the trial court outlined the testimony of the interrogating officers to the effect that they did not ask appellant questions about the unrelated robbery charge and their testimony that appellant never asked to speak to his lawyer from that robbery case. The trial court did not, however, set out the testimony offered by appellant to the contrary. *See* n.5, *infra.*

Testimony pertaining to incident four of the above alleged factual inconsistencies does not appear in the trial court's outline of the testimony. *See* n. 5, supra. Although the trial court did not refer to testimony involving that incident, that testimony was directed to the issue of whether appellant had asked to talk to his attorney and, if so, what officers Roberts and Hoffman told him in response to such request. In its findings, the court recognized that "[a]t no time did [appellant] ever request to have his attorney present during the course of the interview with Hoffman and Roberts." Further, the trial court found "at no time did [appellant] state he wanted to have an attorney present prior to or during any questioning; at no time did he indicate he wanted an attorney present to advise him."

We hold the trial court's findings were sufficiently detailed to enable this Court to determine the basis of its ruling. Point of error four is overruled.

In his fifth and sixth points of error, appellant claims the trial court erred in admitting his confessions on the ground the statements were taken in violation of his Fifth and Sixth Amendment rights to counsel. Appellant was in custody for aggravated robbery when questioned by police about the instant capital offense. Appellant maintains he was entitled, under the Sixth Amendment, to have his attorney in the robbery case present at his interrogation concerning the capital offense, and also claims he invoked his Fifth Amendment right to counsel during that interrogation.

▪ The Sixth Amendment right to counsel guarantees that "in all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defense." It is viewed as being "offense specific" and attaches only at the initiation of a formal adversarial criminal proceeding. *United States v. Gouveia*, 467 U.S. 180, 188, 104 S.Ct. 2292, 81 L.Ed.2d 146 (1984). Before a criminal proceeding is initiated, a suspect in a criminal investi-

gation has no constitutional right to the assistance of counsel. *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

▪ In *Green v. State*, 934 S.W.2d 92 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997), the defendant was arrested for aggravated robbery, while a suspect in an unrelated murder. The defendant was charged with the aggravated robbery and appointed an attorney to represent him in that case. Subsequently, officials determined that the gun recovered from the aggravated robbery was also the gun used in the murder. The defendant was read his rights and questioned in connection with the murder, but his attorney in the robbery case was not informed. During questioning, the defendant incriminated himself in the murder. We held there was no Sixth Amendment right to counsel violation because adversarial criminal proceedings had not yet been initiated against the defendant for the murder. *Id.* at 98. As stated by the United States Supreme Court in *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), because the Sixth Amendment is offense specific "it cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced."

▪ In the instant case, when appellant was charged with aggravated robbery, his Sixth Amendment right to counsel attached with respect to that offense. Appellant's invocation of his Sixth Amendment right to counsel with respect to the robbery offense did not extend to the capital offense. No Sixth Amendment right to counsel had attached to the capital murder offense at the time of appellant's interrogation concerning it. *Green*, 934 S.W.2d at 99; *McNeil*, supra.

Appellant acknowledges the Sixth Amendment right to counsel is offense specific, but argues it nonetheless applied here for two reasons. First, he argues, "the matters inquired into by police as to

the capital murder are intertwined with the matters involved in the aggravated robbery case." Appellant says the two cases were "closely related" because the attorney representing him in the robbery case was. also the attorney representing him in the capital case and would necessarily need to know about any extraneous unadjudicated offenses for purposes of punishment evidence and because the weapon recovered from appellant when he was arrested for the robbery was alleged to be the weapon used in the murder case. The fact that the same attorney appointed to represent appellant in the robbery might also represent appellant in the capital case is of no moment for Sixth Amendment purposes since appellant had not yet been charged in the capital case. Further, appellant's attorney in the robbery case would have access to information about the State's intentions to introduce evidence of appellant's involvement in extraneous acts pursuant to article 37.07 § 3(g), which requires that the State, upon request by the defendant, give notice of its intent to introduce evidence of unadjudicated acts.

■ Second, appellant argues, "the credible evidence in the motion to suppress hearing shows the officers were making inquiries about the aggravated robbery case and the trial court's findings to the contrary are not supported by the record." We also reject this contention. Despite the trial court's apparent misstatement of the record in its summary of appellant's testimony,[7] there was nonetheless evidence in the record to support the trial court's findings. The interrogating officers' testimony that they did not discuss the robbery case during appellant's interrogation is sufficient support for the trial court's findings.

■ Appellant relies on *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in support of his Fifth Amendment right to counsel claim. In *Edwards*, the United States Supreme Court held that once a suspect invokes his Fifth Amendment right to counsel, he cannot be further interrogated by the police until counsel has been provided for him, or unless the suspect himself reinitiates the interrogation. *Id.* at 484–85, 101 S.Ct. 1880. Invocation of an accused's Fifth Amendment right to counsel "requires, at a minimum, some statement that can be reasonably construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *Green*, 934 S.W.2d at 97 (citing, *McNeil*, 501 U.S. at 178, 111 S.Ct. 2204).

■ There was conflicting testimony as to whether appellant requested his attorney during the interrogation. The interrogating officers testified that appellant did not ask to speak to an attorney; appellant testified that he requested to talk to his attorney. The trial court found that appellant was fully aware of his rights, including the rights to remain silent and to seek the assistance of counsel. The trial court further concluded that appellant knowingly, intelligently, and voluntarily waived his rights. There is evidence in the record supporting these findings. Because the trial court is in the best position to evaluate the credibility of the witnesses and their testimony, we defer to the trial court's findings. Appellant's fifth and sixth points of error are overruled.

In points of error seven through ten, appellant claims the trial court erred in excluding the testimony of four prospective witnesses before the jury. Appellant contends the testimony of Duer, Gottleib, Scott, and Yarborough, *see* n. 5, supra, was relevant and admissible for purposes of the jury's evaluation of both the credibility of the investigating officers and, ultimately, the voluntariness of appellant's confes-

---

**7.** In summarizing appellant's testimony, the trial court stated that appellant did not suggest or infer that Hoffman, Roberts, or any other officer discussed the robbery offense during the interrogation on the capital case. Appellant points to testimony in which he did, in fact, aver that the robbery was discussed during his interrogation.

sions. Appellant argues the events surrounding appellant's custodial statements are relevant as impacting the reliability of the statements. Appellant claims the trial court's exclusion of the testimony violated his due process right to present a defense.

The prospective witnesses would have testified about a conversation that allegedly took place in a judge's chambers concerning how the officers elicited appellant's confessions. Specifically, three of the witnesses would have testified to overhearing the interrogating officers say that they had contacted appellant's lawyer (Duer) and received permission from him to question appellant outside of his presence concerning the instant capital murder. The fourth witness, Duer, would have testified that he was, in fact, never contacted by the officers. Both of the investigating officers denied any such conversation. The trial court sustained the State's objection to the testimony of the four prospective witnesses on the ground that no issue had been raised before the jury regarding the voluntariness of appellant's confession.

The United States Supreme Court addressed a similar issue in *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). In *Crane*, the petitioner sought to introduce testimony concerning the length of his interrogation and the manner in which it was conducted, in an effort to demonstrate the confession was not reliable. *Crane*, 476 U.S. at 684, 106 S.Ct. 2142. The trial court excluded the testimony on the ground that it was relevant only to the issue of voluntariness, which was not before the jury. The Supreme Court disagreed, holding that exclusion of the evidence deprived the petitioner of his due process right to a fair opportunity to present his defense in that case. *Id.* at 691, 106 S.Ct. 2142. The high Court explained that its holding in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) (that a defendant was entitled to a determination of the voluntariness of a confession outside the presence of the jury), did not "undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of trial." *Id.* at 688, 84 S.Ct. 1774. The Court drew a clear distinction between the voluntariness of a confession, a legal issue, and the separate question of its reliability, a factual question:

[B]ecause "questions of credibility, whether of a witness or of a confession, are for the jury," the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial." ... "A defendant has been as free since *Jackson* as he was before to familiarize a jury with circumstances that attend the taking of his confession, including facts bearing upon its weight and voluntariness."

Thus, as *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) and *Jackson* make clear, to the extent the Court has addressed the question at all, it has expressly assumed that evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess. ... The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. ... Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question on voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

*Crane,* 476 U.S. at 688–89, 106 S.Ct. 2142 (emphasis in original).

But a defendant's case may not always stand or fall on the credibility of his confession. The circumstances surrounding the petitioner's confession in *Crane* were intrinsically connected to his defense which was a claim of innocence. There, a liquor store clerk was shot during the course of a robbery. There was no physical evidence connecting anyone to the crime. A week later the petitioner, then sixteen, was arrested for suspected participation in an unrelated service station holdup. Police testified at the suppression hearing that " 'just out of the clear blue sky,' petitioner began to confess to a host of local crimes, including shooting a police officer, robbing a hardware store, and robbing several individuals at a bowling alley.... After initially denying any involvement in the Keg Liquors shooting, petitioner eventually confessed to that crime as well." *Id.* at 684, 106 S.Ct. 2142. At a suppression hearing, the petitioner testified "he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and had been denied permission to telephone his mother, and that he had been badgered into making a false confession." *Id.* at 685, 106 S.Ct. 2142. In concluding the state court erred in holding the evidence regarding the circumstances of the petitioner's confession inadmissible, the Supreme Court emphasized the importance of those facts in the context of the petitioner's defense:

> [The] opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is *central to the defendant's claim of innocence.* In the absence of any valid state justification, exclusion of this kind of exculpa-

tory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and "survive the crucible of meaningful adversarial testing." [citations omitted]

Under these principles, the Kentucky courts erred in foreclosing petitioner's efforts to introduce testimony about the environment in which the police secured his confession. As both *Lego* and *Jackson* make clear, evidence about the manner in which a confession was obtained is often highly relevant to its reliability and credibility. *Such evidence was especially relevant in the rather peculiar circumstances of this case.* Petitioner's entire defense was that there was no physical evidence to link him to the crime and that, for a variety of reasons, his earlier admission of guilt was not to be believed. To support that defense, he sought to paint a picture of a young, uneducated boy who was kept against his will in a small, windowless room for a protracted period of time until he confessed to every unsolved crime in the county, including the one for which he now stands convicted.

*Id.* at 691, 106 S.Ct. 2142 (emphasis added).

 The instant case is distinguishable from *Crane.* In *Crane,* the petitioner's defense was that he was innocent of the allegations, but was coerced into making a *false* confession. In the instant case, the reliability of appellant's confessions were not central to and did not bear on the presentation of any defense appellant asserted. While appellant argued his confessions were involuntary because he claims he requested a lawyer, he never suggested they were *false* or otherwise unreliable. Moreover, the facts contained in appellant's confessions are consistent with other evidence presented in the case.[8] Appellant

---

8. In *Crane,* the petitioner intended to introduce evidence that the details in petitioner's confession were at odds with the facts of the offense:

> [D]efense counsel outlined [in her opening argument] what would prove to be the principle avenue of defense advanced at trial— that, for a number of reasons, the story

argues the excluded testimony was relevant to the credibility of the interrogating officers. Even assuming the testimony had impeachment value and was relevant in that limited respect, relevant evidence may be excluded if its probative weight "is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." TEX.R.CRIM. EVID. 403. Given its limited relevance in the scope of this case, it would not be unreasonable. to conclude such evidence would be a greater source of confusion than insight to the jury, and consequently have little probative value. We hold *Crane* does not compel introduction of the excluded testimony on due process grounds. Points of error seven, eight, nine and ten are overruled.

In his eleventh point of error, appellant claims the trial court erred in denying the admission of his former testimony under Texas Rule of Evidence 804(b). Appellant sought to introduce before the jury his testimony from the suppression hearing. He argues that, under Rule 804, if a person has testified in another hearing of the same proceeding and both parties have had an opportunity to direct or cross-examine the witness and the witness invokes his Fifth Amendment right not to testify, then his prior testimony should be admitted. Appellant invoked his Fifth Amendment right not to testify and claims that by invoking this right he is considered "unavailable" within the meaning of Rule 804.

■■■ Rule 804 provides, in part, that a declarant is not unavailable if his exemption from testifying is procured by the party offering the declarant's testimony:

> A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purposes of preventing the witness from attending or testifying.

TEX. R. CRIM. EVID. 804(a). This issue has been decided adversely to appellant. In *Davis v. State*, 961 S.W.2d 156, 157 (Tex.Crim.App.1998), we held that a defendant who invokes his Fifth Amendment right not to testify is not unavailable for purposes of Rule 804 when he seeks to introduce his own prior testimony. A declarant "is not unavailable if his exemption from testifying is procured by the party offering the declarant's testimony." *Id.* at 156. As in *Davis*, appellant is the proponent of his prior testimony. Point of error eleven is overruled.

■■■ In his twelfth point of error, appellant contends the trial court erred in allowing the admission of State's Exhibit No. 1, which appellant claims is inadmissible hearsay. The State argues the document is admissible under the hearsay exception provided in Texas Rule of Criminal Evidence 803(15), *Statements in Documents Affecting an Interest in Property*.

State's Exhibit No. 1, entitled "Trial Inventory and Appraisement of Robert A. Fratta," reflects that it was filed in the 308th District Court of Harris County, Texas, in the Matter of the Marriage of Farah Fratta and Robert Alan Fratta. Listed among the "Community Estate of the Parties" is a 1980 Jeep CJ–7 in the possession of Robert Fratta.[9] The docu-

petitioner had told police should not be believed. The confession was rife with inconsistencies, counsel argued. For example, petitioner had told the police that the crime was committed during daylight hours and that he had stolen a sum of money from the cash register. In fact, counsel told the jury, the evidence would show that the crime occurred at 10:40 p.m. and that

no money at all was missing from the store. Beyond these inconsistencies, counsel suggested, "[t]he very circumstances surrounding the giving of the [confession] are enough to cast doubt on its credibility." *Crane*, 476 U.S. at 685, 106 S.Ct. 2142.

9. Robert Fratta, the husband of the deceased, hired Joseph Prystash to kill his wife. Prystash hired appellant to assist him in carrying

ment reflects the existence of a lien on the vehicle with a balance of $4,500, and a net equity of $3,500. The document was filed in Fratta's divorce as evidence of his and the deceased's respective interests in various property. The document was executed under oath by Robert Fratta.

Rule 803(15), provides that there is no hearsay bar to the introduction of:

A statement contained in a document purporting to establish or affect an interest in property if the matter stated was relevant to the purpose of the document, unless dealings with the property since the document was made have been inconsistent with the truth of the statement or the purport of the document.

TEX.R.CRIM. EVID. 803(15). In *Madden v. State,* 799 S.W.2d 683 (Tex.Crim.App. 1990), *cert. denied,* 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991), the trial court admitted a handwritten list of the victim's weapons with corresponding serial numbers, which was found among the victim's personal papers after his death. Although hearsay, we held the document was admissible under Rule 803(15), as a document affecting an interest in property. We reached this conclusion by looking to the rationale behind the exception and noting the general reliability of such documents. Further noting that hearsay exceptions should be liberally construed and not mechanistically applied, we held the document "was admissible as a statement affecting an interest in property, although it was not a legally executed document such as a mortgage":

First, the document is a list of the weapons which [the victim] owned and their corresponding serial numbers, thus indicating his interest in the property. Secondly, the document bears more than an adequate indicia of reliability. [The victim's wife] authenticated the document by testifying that the list was definitely in [the victim's] handwriting and that the list was among his personal papers. It is reasonable to assume, although

there was no such testimony, that [the victim] made this list for his own protection, i.e. insurance papers, in case of theft or loss of one or all of the weapons, and the recitals therein are "germane to the purpose of the document."

*Id.* at 698.

Appellant correctly views State's Exhibit No. 1 as hearsay. It is an out-of-court statement offered for the truth of the matter asserted (that Fratta had a property interest in a Jeep). The document falls within the parameters of the hearsay exception provided in Rule 803(15), however. Like the document at issue in *Madden,* State's Exhibit No. 1 does not "establish" or "affect" an interest in property in the sense of a deed or mortgage, but reflects Fratta's interest in the property listed there and it "bears more than an adequate indicia of reliability." The document at issue in this case bears an even greater indicia of reliability than the document in *Madden.* Here, the document was executed under oath and filed in a district court in connection with a matter that would ultimately affect the property interests listed in the document. The trial court did not err in admitting the document. *Madden, supra.* Appellant's twelfth point of error is overruled.

In his thirteenth and fourteenth points of error, appellant contends the trial court erred in admitting the testimony of Mary Gipp, girlfriend of co-defendant Joseph Prystash. Gipp testified to statements made to her by Prystash about his and appellant's roles in the instant murder. Appellant claims the statements are hearsay and not subject to an exception. The State concedes the statements are hearsay by arguing that they were properly admitted because they fall within an exception to the hearsay rule. Appellant also claims the statements violated his rights under the Sixth Amendment's Confrontation Clause. Appellant identifies three issues presented in this context: (1) whether the

out the crime. Fratta promised Prystash that he would receive a jeep as remuneration.

statements were made "during the course and in furtherance of the conspiracy" so as to qualify as statements by a party-opponent under Texas Rule of Criminal Evidence 801(e)(2); (2) whether the statements qualify as statements against penal interest under Texas Rule of Criminal Evidence 803(24); and (3) whether, even if admissible under the Texas Rules of Criminal Evidence, the statements are nonetheless barred by the Confrontation Clause.

■■■ Rule 801(e)(2)(E) provides that a statement by a co-conspirator is not hearsay if the statement is offered against a party and is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." TEX. R. CRIM. EVID. 801(e)(2)(E). In order to satisfy this exception, the State must show that a conspiracy existed in which the co-conspirator was a member of or later participated in the conspiracy, and that the statements made were the object and purpose of the conspiracy. *Ward v. State,* 657 S.W.2d 133 (Tex.Crim.App.1983).

■■■ The evidence reflects the existence of a conspiracy to murder Farah Fratta, in which appellant, Robert Fratta, and Prystash participated. The statements made by Prystash to Gipp were made during the time the murder was being planned, immediately preceding the murder, and after the murder in connection with collecting the remuneration. These statements were made "during" the conspiracy. The further question is whether the statements were also made "in furtherance of" the conspiracy:

> [I]t cannot now be said that in order to be admissible as against a hearsay objection, an out-of-court statement of a co-conspirator need only be in the

course or merely somehow "related to" the conspiracy. Some substance must be given to the rule's requirement, not only that the statement was made "in the course" of the conspiracy, but also that it was made "in furtherance" thereof.

*Williams v. State,* 790 S.W.2d 643 (Tex. Crim.App.1990). A statement made "in furtherance" of a conspiracy is made in an effort to "advance the cause of the conspiracy" or "serve . . . to facilitate the conspiracy." *Deeb v. State,* 815 S.W.2d 692, 697 (Tex.Crim.App.1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3038, 120 L.Ed.2d 907 (1992).

Prystash's statements to Gipp did nothing to advance the cause of or facilitate the conspiracy. The statements were not made in an effort to enlist Gipp's assistance or cooperation, elicit information that could be used in the conspiracy, or do anything other than report the status of the conspiracy to Gipp. Prystash was merely describing to Gipp what was occurring or what had occurred. Because the conspiracy was not *furthered* by Prystash's conversations with Gipp, the statements were not admissible under Rule 801(e)(2)(E).

■■■ The next question is whether the statements were admissible under Rule of Criminal Evidence 803(24), which provides that a statement against the declarant's interest may be admissible if corroborating circumstances clearly indicate the statement's trustworthiness.[10] Appellant points out that a number of Prystash's statements to Gipp incriminated appellant, as well as Prystash. Appellant argues that to qualify as a statement against interest under Rule 803(24), the statement must be against the *declarant's* interest. Thus, ap-

---

10. Rule 803(24) provides:

**Statement Against Interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred,

ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. TEX. R. CRIM. EVID. 803(24).

pellant maintains, the portions of Prystash's statements that implicated appellant were not admissible as statements against Prystash's interest. We agree.

■ We have recognized that Rule 803(24) "provides for an exception to the hearsay rule for a statement against the *declarant's* interest[, but] . . . does not provide a hearsay rule exception for a declarant's statement which is against *someone else's* interest, e.g. a third-party, a co-actor, or a co-defendant." *Cofield v. State*, 891 S.W.2d 952, 955 (Tex.Crim.App. 1994). That is, unless the statement against the third party's interest *is also* sufficiently against the declarant's interest as to be reliable. For example, in *Dewberry v. State*, 4 S.W.3d 735, 744–45 (Tex. Crim.App. 1999), statements in which the declarant ("Chris") incriminated both himself and the defendant, jointly, were held sufficiently reliable:

> The State was careful to elicit accounts only of statements made by Chris referring to "we," which included both him and appellant. An admission against a co-defendant declarant's interest can be admissible against the defendant so long as it is sufficiently against the declarant's interest to be reliable. [citation omitted] Because Chris's statements containing "we" implicated him in the capital murder of Rode, this Court concludes that his statements were sufficiently self-inculpatory to be reliable[.]

The statements made by Prystash in the instant case are not so equally against both Prystash's and appellant's interests as reach this level of reliability. While some of Prystash's statements refer to "we," meaning both himself and appellant, on the critical issue of who killed the victim, Prystash's statements inculpate appellant alone as the triggerman and describe with specificity how "appellant" killed the victim. Prystash told Gipp he just dropped appellant off at the victim's residence and picked him up after appellant had committed the murder. Granted both driver and triggerman bear potentially equal criminal liability, but the driver might be in a better bargaining position should he decide to cooperate with the State, and the driver might have a better chance at gaining sympathy from the jury. Because Prystash's statements so clearly delineate his and appellant's roles on the critical issue of who killed the victim, we hold the statements made by Prystash which were against appellant's interest were not admissible under Rule 803(24).

Thus, Gipp's testimony in which she described Prystash's statements against his own interest was admissible under the Rules of Evidence, while the testimony relating Prystash's statements against appellant's interest was not admissible under the Rules.[11] Appellant argues, despite admissibility under the Rules of Evidence, *all* of the statements were inadmissible under the Confrontation Clause. We will address the Confrontation Clause implications as to both of these groups of statements.

■ Admission of hearsay evidence against a criminal defendant implicates the Confrontation Clause of the Sixth Amendment because the defendant is not afforded the opportunity to confront the out-of-court declarant. *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Nonetheless, a hearsay statement may be introduced against a defendant if the statements bears sufficient "indicia of reliability." *Id.* at 66, 100 S.Ct. 2531. A hearsay statement is *per se* reliable under the Confrontation Clause if it falls within a "firmly rooted" exception to the hearsay rule.[12] *White v. Illinois*, 502 U.S. 346, 356,

---

11. For reasons explained below, we conclude admission of the statements against appellant's interest was harmless.

12. In *Roberts,* the Supreme Court required a showing that the declarant is unavailable before his out-of-court statement could be admitted. This requirement has since been limited to hearsay statements made in the course of a prior judicial proceeding:

112 S.Ct. 736, 116 L.Ed.2d 848 (1992)("where proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied"); *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)(admission under firmly rooted exception satisfies constitutional requirement of reliability because of weight of long-standing judicial and legislative experience in assessing trustworthiness of certain types of out-of-court statements). A statement against penal interest is a "firmly rooted" exception. *Dewberry v. State,* 4 S.W.3d 735, 751–54 (Tex.Crim.App. 1999); *see also United States v. Barone,* 114 F.3d 1284, 1302 (1 st Cir.)(Confrontation Clause not violated by admission of co-conspirator's statements as statements against penal interest because exception "firmly rooted"), *cert. denied,* 522 U.S. 1021, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997); *Neuman v. Rivers,* 125 F.3d 315, 318 (6 th Cir.)(Confrontation Clause not violated by admission of hearsay statements as statements against penal interest because exception "firmly rooted"), *cert. denied,* 522 U.S. 1030, 118 S.Ct. 631, 139 L.Ed.2d 610 (1997). Even if a hearsay statement does not fall within a "firmly rooted" exception, it may nonetheless be sufficiently reliable for Confrontation Clause purposes if it has "particularized guarantees of trustworthiness." [13] *Wright,* 497 U.S. at 816, 110 S.Ct. 3139; *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531. The trustworthiness of hearsay evidence must be evaluated in light of the totality of the circumstances with a court considering "only those [circumstances] that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright,* 497 U.S. at 819, 110 S.Ct. 3139. Other evidence admitted at trial that may corroborate the hearsay cannot be considered in determining trustworthiness. *Id.* at 822, 110 S.Ct. 3139. The trustworthiness requirement is satisfied if it can be concluded that cross-examination would be of only "marginal utility." *Id.* at 819, 110 S.Ct. 3139. Put another way, there must be "an affirmative reason arising from the circumstances in which the statement was made" which provides a basis for rebutting the presumption that a hearsay statement is not reliable. *Id.*

 As previously discussed, Gipp's testimony as to statements made by Prystash that were against his own penal interest was admissible. Those statements were *per se* reliable and thus admissible under the Confrontation Clause, as state-

In the course of rejecting the Confrontation Clause claim in [*Roberts* ], we used language that might suggest that the Confrontation Clause generally requires that a declarant either be produced at trial or be found unavailable before his out-of-court statement may be admitted into evidence. However, we think such an expansive reading of the Clause is negated by our subsequent decision in *Inadi, supra* [U.S. v. Inadi, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)]. . . . So understood, *Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry only when the challenged out-of-court statements were made in the course of a prior judicial proceeding.

*White,* 502 U.S. at 353–54, 112 S.Ct. 736.

**13.** Our opinion in *Dewberry, supra,* could be read as indicating that a reliability analysis must be conducted *in addition to* a determination of whether the challenged hearsay statements fall within a firmly rooted exception to the hearsay rule. *Dewberry,* at 753–54. This point needs clarification. If a hearsay statement falls within a "firmly rooted" hearsay exception, it is *per se* reliable. No additional analysis as to its reliability need be made. The reason for this was explained by the United States Supreme Court in *Wright:*

Admission under a firmly rooted hearsay exception satisfies the constitutional requirement of reliability because of the weight accorded longstanding judicial and legislative experience in assessing the trustworthiness of certain types of out-of-court statements.

*Wright,* 497 U.S. at 817, 110 S.Ct. 3139. Only if a hearsay statement does not fall within a "firmly rooted" exception, must it be subjected to a reliability analysis in which a showing of "particularized guarantees of reliability" is required. *Id.* at 816–18, 110 S.Ct. 3139.

ments falling within a "firmly rooted" hearsay exception. As previously explained, Gipp's testimony as to statements made by Prystash against appellant's interest, however, does not fall within a hearsay exception. Moreover, it is doubtful these statements possessed "particularized guarantees of trustworthiness" sufficient to overcome the presumption of hearsay unreliability. We decline to debate the trustworthiness of the statements, however, as any error in their admission did not contribute to appellant's conviction or punishment.[14] Tex.R.App. Proc. 44.2(a).

Gipp's testimony as to Prystash's statements against appellant's interest were a small part of a much larger and more comprehensive picture of the evidence. Appellant gave two lengthy written statements detailing his participation in the offense. Many of the details in these statements were consistent with and corroborated admissible portions of Gipp's testimony, as well as other evidence. In addition to the written confessions, appellant cooperated in a videotaped statement and walk-through of the crime scene in which he again confessed to the killing and demonstrated how and where the crime was committed.[15] While the portions of Gipp's testimony pertaining to statements against appellant's interest may have been admitted in violation of the Confrontation Clause, most of her testimony was admissible and much of it implicated appellant. Gipp testified that appellant lived in the apartment next to her; she and appellant shared a staircase and landing. Gipp also testified that Prystash was her boyfriend and that he stayed at her apartment most of the time. According to Gipp, she observed Prystash and appellant talking with each other on numerous occasions and that their conversations became more frequent in the month before the murder. Gipp testified that Prystash told her he was planning the murder and explained that the date selected would provide Robert Fratta with the alibi of being at church with his children. On the day of the murder, when Gipp arrived home at 4:00 or 4:30 p.m., appellant was sitting on the staircase landing and told her he was waiting for Prystash. Prystash arrived about 30 minutes later, changed clothes and left. Gipp testified that Prystash got back about 8:30 p.m., and she saw appellant enter his own apartment at the same time. Prystash went into the bedroom and unloaded a gun. He told Gipp he had gotten the gun from Robert Fratta. Gipp testified that Prystash left the apartment an hour later to meet Robert Fratta. After he left, Gipp said she recovered the bullet casings from the trash and wrote down the name and make of the gun.[16] Gipp noticed the gun was gone the next day.

Neighbors who lived across the street from the deceased testified to hearing a gunshot about 8:00 p.m.. While dialing 911, one of the neighbors testified to seeing a black man, dressed in black, in the decedent's garage. She then saw the man get into a silver car that pulled up and drove away. Her husband also testified to seeing a man of the same description. Gipp had testified that both appellant and Prystash were wearing black.

Officers testified that a gun found in appellant's possession when he was arrest-

14. Although the statements were also inadmissible under the Rules of Evidence, we will not conduct a separate harm analysis under Rule of Appellate Procedure 44.2(b), since subsection (a) establishes a more stringent standard than subsection (b).

15. In his first written statement, appellant stated that he was the driver and Prystash was the gunman. In his second written state-ment appellant admitted to being the gunman and reported that Prystash was the driver. The videotaped confession and crime scene walk-through was consistent with appellant's second statement.

16. There was also testimony that Gipp had written down the serial number of the gun, and that it matched the serial number of the gun later found in appellant's possession.

ed matched Gipp's written notes describing the gun Prystash unloaded the night of the murder. Ballistics experts determined this was the gun used to commit the offense.

Gipp's admissible testimony, the testimony of the victim's neighbors, appellant's two written confessions, appellant's videotaped statement and walk-through of the crime scene, and the discovery of the murder weapon in appellant's possession all rendered the inadmissible portions of Gipp's testimony relatively insignificant. We conclude beyond a reasonable doubt, in light of this evidence, that admission of Prystash's statements regarding appellant's participation in the offense did not contribute to his conviction or punishment. Points of error thirteen and fourteen are overruled.

In his fifteenth point of error, appellant claims the trial court erred in overruling his hearsay objection to testimony by Detective Valero that Gipp's name and phone number were listed in the address book belonging to Robert Fratta.

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. CRIM. EVID. 801(d). Thus, a statement which is not offered to prove the truth of the matter asserted, but is offered for some other reason, is not hearsay. *Jones v. State*, 843 S.W.2d 487, 499 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). Valero's testimony was not offered for the purpose of proving that the phone number was actually Gipp's. Rather, Valero's testimony was admissible as circumstantial evidence of the link between Gipp's boyfriend, Prystash and Robert Fratta, the conspiracy which ultimately involved appellant.

In *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex.Crim.App.), *cert. denied*, 516 U.S. 832, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995), the State offered into evidence an appointment book containing a name similar to the defendant's and a patient application form listing his name. We held these items were not hearsay, explaining that "[a]n extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." That reasoning applies here. The trial court did not err in overruling appellant's hearsay objection to Valero's testimony regarding the address book. Appellant's fifteenth point of error is overruled.

In his sixteenth point of error, appellant claims the trial court erred in overruling his objection to the admission of State's Exhibit No. 60, a firearm recovered by Deputy Moore from a backpack belonging to appellant. Appellant argues the identification of the Exhibit was based on hearsay because Moore relied in part on a serial number recorded in an out-of-court report prepared by another officer.

Appellant's objection at trial does not comport with his complaint on appeal. Appellant objected to the admission of the Exhibit "in that [Moore] has no independent way of identifying the same." While not completely clear, this objection appears to implicate Rule of Criminal Evidence 901(a), regarding authentication and proper predicate. But appellant does not cite to or make any argument under Rule 901 in his brief. Although the basis for his argument in his brief is not abundantly clear, it is not based on Rule 901.[17] Appellant's sixteenth point of error is overruled.

---

17. In his brief appellant says the report on which Moore relies and in which the serial number was recorded is hearsay under Rule of Criminal Evidence 803(8), since that rule excludes police reports from admissibility. He then argues in a single conclusory statement, "Therefore Moore's purported identification of State's Exhibit 60 was insufficient to establish the weapon was the same weapon recovered from Appellant and Appellant's objection to the admission of the exhibit into evidence should have been sustained."

In his seventeenth and eighteenth points of error, appellant claims the trial court erred in sustaining the State's hearsay objections to two questions posed to Deputy Billingsley on cross-examination.[18] Appellant argues the trial court should have allowed the witness to answer the questions for various reasons.[19]

■ Error in the exclusion of evidence may not by urged unless the proponent perfected an offer of proof or a bill of exceptions. *See Green v. State*, 840 S.W.2d 394, 407 (Tex.Crim.App.1992), *cert. denied*, 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993). The record in this case does not indicate what the excluded testimony would have been. Absent a showing of what such testimony would have been, or an offer of a statement concerning what the excluded evidence would show, nothing is presented for review. *Stewart v. State*, 686 S.W.2d 118 (Tex.Crim.App.1984), *cert. denied*, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985). Points of error seventeen and eighteen are overruled.

In his nineteenth point of error, appellant claims the State failed to provide him with proper notice of certain extraneous offenses it offered against him at the punishment stage. Appellant contends he was entitled to notice of the extraneous offenses pursuant to Texas Code of Criminal Procedure Article 37.07 § 3(g), and Texas Rule of Criminal Evidence 404(b).[20]

■ Texas Rule of Criminal Evidence 404(b), which contains a notice provision, explicitly governs character evidence and extraneous offenses at the guilt/innocence phase of trial. Rule 404(c), which does not provide a notice provision, then governed character evidence and extraneous offenses at punishment. In deciding questions concerning the admissibility of character and extraneous offense evidence at the punishment stage of trial, the governing statute was Rule of Criminal Evidence 404(c).[21] *Vuong v. State*, 830 S.W.2d 929, 942 (Tex.Crim.App.), *cert. denied*, 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992).

■ Similarly, Texas Code of Criminal Procedure article 37.07 does not apply to punishment procedure in capital cases. The appropriate procedure for punishment in capital cases is founded in article 37.071. Neither Rule 404(c) nor article 37.071 requires notice concerning the use of extraneous offense evidence at punishment. Appellant's nineteenth point of error is overruled. *Adanandus v. State*, 866 S.W.2d 210, 233 (Tex.Crim.App.1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994); *Vuong*, 830 S.W.2d at 942.

---

**18.** Appellant complains of the trial court's sustaining of the following objections:

> [Appellant's Counsel]: Did Detective Ronnie Roberts ever tell you that Howard Paul Guidry told him that he had an attorney on his other case?
> [Prosecutor]: Judge, I'm going to object. That's hearsay to this officer.
> [The Court]: Sustained.
> [Appellant's Counsel]: You monitored that interview, did you not?
> [Billingsley]: Parts of it.
> [Appellant's Counsel]: Did you learn during the monitoring of that interview that Howard Paul Guidry, in fact, informed one of your detectives that he did, in fact, have an attorney?
> [Prosecutor]: Objection. It's hearsay.
> [The Court]: Sustained.

**19.** He says the questions did not call for answers that were hearsay, he argues the answers would have been admissible under the rule of optional completeness, and he maintains the answers would have been admissions of a party-opponent.

**20.** The Texas Rules of Criminal Evidence and the Texas Rules of Civil Evidence were consolidated as the Texas Rules of Evidence, effective March 1, 1998, subsequent to appellant's trial. The Texas Rules of Criminal Evidence were in effect during appellant's trial, and therefore apply to questions regarding admissibility of evidence in this appeal.

**21.** While Rule of Criminal Evidence 404(c) was in effect at the time of appellant's trial, it no longer exists per the newly consolidated Rules of Evidence. *See* fn. 20, infra.

In points of error twenty and twenty-one, appellant claims the prosecutor argued outside the record when he stated that a co-defendant in the case had received the death penalty. Appellant claims the prosecutor's jury argument was improper and as a result, the trial court erred in not entering a mistrial or granting his motion for new trial. Appellant contends the prosecutor intentionally injected this new fact into evidence during closing argument at punishment. He further claims that because the prosecutor's statement prejudiced his defense, the conviction should be reversed and a new trial ordered on punishment.

During the State's closing argument at punishment, the following transpired:

[Prosecutor]: Now, Lex Baquer and his wife are 60 now. They are over 60 now. And the argument is that that poor boy will be 60 if he gets life. They're 60 now and what are they doing now? What are they doing now? After they've retired, after they've paid all those years like you and I have, what are they doing now? They're raising three kids like they are brand new newly weds. They are raising three kids. There is no mother. *The father is on death row.* They are raising three kids.

[Appellant's Counsel]: Your Honor, we object to that. That's outside the record. We had that issue before and he knew he wasn't supposed to bring that up.

[The Court]: The Jury heard the testimony of the witnesses that were presented. What the lawyers say is not evidence. The Jury will be governed by the testimony you remembered having heard.

[Appellant's Counsel]: Judge, may I have a ruling on my objection?

[The Court]: That's the ruling.

[Appellant's Counsel]: Your Honor—

[The Court]: What the lawyers say is not evidence.

[Appellant's Counsel]: Is my objection overruled or—

[The Court]: No, sir, it's not overruled.

[Appellant's Counsel]:—sustained? Well, then, Your Honor, we ask for an instruction that this Jury be instructed to disregard Mr. O'Brien's last comments.

[The Court]: Ladies and gentlemen, disregard any comments that were made that were not raised by the evidence.

[Appellant's Counsel]: Your Honor, we move for a mistrial.

[The Court]: That's denied.

(emphasis added). Appellant asserts the prosecutor's statement that "the father is on death row" is improper because it informed the jury of a fact not in evidence. He further argues the statement was not cured by the trial court's instruction to disregard, and therefore, the trial court erred in not granting a mistrial or his motion for a new trial.

A proper jury argument must fall within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and, (4) plea for law enforcement. *Cannon v. State*, 668 S.W.2d 401, 404 (Tex.Crim.App. 1984). Error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper. *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim.App.1988), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). Even assuming there is no evidence in the record that mentions the co-defendant's case and/or sentence, the instruction given to the jury to disregard the prosecutor's statement was prompt and sufficient to cure the error. *Kinnamon v. State*, 791 S.W.2d 84, 89 (Tex.Crim.App. 1990). Appellant's twentieth and twenty-first points of error are overruled.

In his twenty-second and twenty-third points of error, appellant challenges the

trial court's decision to permit the jury to continue deliberating after they twice indicated an inability to reach a unanimous verdict on Special Issue No. 2.

The jury began deliberating on the special issues on March 25, 1997, at 11:30 a.m.. After deliberating for just over two and one-half hours (3:05 p.m.), the jury sent out the following note:

> We have unanimously answered yes to issue # 1. Issue Number two we have 9 no's and 3 yes's. The jurors that have answered yes have informed us that they will not change their mind. Please advise us as how to proceed.

The trial court informed counsel of the note, denied appellant's motion for an automatic life sentence, and instructed the jurors to continue deliberating. The jury continued deliberating until 5:15 p.m., at which point they sent out a second note:

> On issue No. 2 we are still 9 for no and 3 for yes. We do not feel this is going to change. Please advise.

Appellant once again requested an automatic life sentence. The trial court denied the request and ordered that the jurors be sequestered for the night. The following morning, March 26, 1997, at 9:53 a.m., after deliberating for an hour, the jurors returned a verdict resulting in the death sentence. Appellant contends the trial court erred in requiring the jurors to continue deliberations and urges this Court to remand this case to the trial court for an order to reform the punishment to a life sentence.

■■■■ The Texas Code of Criminal Procedure compels a trial court to enter a life sentence if the jury is unable to answer any special issue. TEX. CODE CRIM. PROC. Art. 37.071 § 2(g). However, the trial court is not constrained to enter a life sentence at the first sign of impasse. *Howard v. State,* 941 S.W.2d 102, 121 (Tex. Crim.App.1996). Rather, the court may do so if it determines, in its discretion, that the jury has been kept together for such a time as to render it altogether improbable

that it can agree. *Id.* There are no time limits on the amount of time a jury may deliberate. TEX. CODE CRIM. PROC. Art. 36.31; *Green,* 840 S.W.2d at 407. The length of time a jury may be held for deliberation in a criminal case rests in the sound discretion of the trial judge, who will not be reversed on appeal absent a showing by appellant that discretion was abused. *Id; Montoya v. State,* 810 S.W.2d 160, 166 (Tex.Crim.App.1989), *cert. denied,* 502 U.S. 961, 112 S.Ct. 426, 116 L.Ed.2d 446 (1991).

■■■ Considering the 176 exhibits and 40 witnesses presented at trial, sending the jury back for further deliberations after they had deliberated for two and a half hours, and again when they had deliberated for just under six hours was well within reason. The trial court did not abuse its discretion in requiring the jury to continue deliberating. Appellant's twenty-second and twenty-third points of error are overruled.

The judgment of the trial court is affirmed.

JOHNSON, J., concurred in points of error thirteen and fourteen, and otherwise joined the opinion.

McCORMICK, P.J., and KELLER, J., concurred.

HOLLAND, J., filed a concurring opinion.

HOLLAND, J., delivered a concurring opinion.

I concur in the judgment of the majority opinion. I write separately, however, to further clarify the Confrontation Clause issue presented in points of error thirteen and fourteen. In those points of error, appellant contends that the trial court erred in admitting statements made by Mary Gipp, appellant's co-defendant's girlfriend, concerning the appellant's and co-defendant's role in the instant offense. Appellant asserts that admitting these

statements violated his rights under the Confrontation Clause.

We recently held in *Dewberry v. State,* 4 S.W.3d 735 (Tex.Crim.App.1999), that the statement against penal interest exception to the hearsay rule is a firmly rooted exception to the Confrontation Clause. Relying on this holding, the majority holds that those statements made by appellant's co-defendant, which were against both the co-defendant's and appellant's interest, did not violate the Confrontation Clause of the Sixth Amendment. *See ante* at 748–49. While I agree with the result reached on this issue, I would adhere to the three-step analysis articulated in *Dewberry.*

First, we must consider whether an unavailability analysis is necessary under *White v. Illinois,* 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). In the instant case, the unavailability analysis is unnecessary because the challenged statement was not made in the course of a prior judicial proceeding. *See Dewberry,* at 752–53. Second, the statements must possess factors of reliability, meaning they must be spontaneous and must tend to be true. *See id.* at 752–53. Finally, the statements must be firmly rooted exceptions to the hearsay rule. In *Dewberry,* we held that the statement against penal interest was a firmly rooted exception to the hearsay rule. *Id.* at 75–54.

I agree with the majority that the other statements made by the co-defendant, which implicated appellant only, are not exceptions to the hearsay rule. Therefore, they are not analyzed in the preceding manner, and they cannot be firmly rooted exceptions to the Confrontation Clause.

With these comments, I concur in the judgment reached by the majority.