In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-00-00200-CR


______________________________




JEFFERY LYNN HARPER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 336th Judicial District Court


Fannin County, Texas


Trial Court No. 19663




 




Before Cornelius, C.J., Grant and Ross, JJ.


Opinion by Justice Grant



O P I N I O N



 Jeffery Harper appeals from his conviction by a jury for the offense of sexual assault of a
child. He raises a single point of error in which he contends that the trial court erred by overruling
his objection to prejudicial jury argument at the guilt/innocence phase of trial that implied prior
misconduct by him.

 The evidence shows that C. H., a fifteen-year-old girl, went out drinking alcohol with another
girl, Harper, co-defendant Edward Workins, and Harper's and Workins's sons. Harper and Workins
eventually took the other girl home, and C. H. testified that while they were taking her home, they
stopped in a field and she was raped. She testified that one man penetrated her while the other held
her and that the other man attempted to have intercourse, but failed. Workins testified that Harper
had intercourse with C. H. and that because of the alcohol and his medications, he (Workins) was
unable to sustain an erection. He also testified that he did not restrain C. H. during the assault. (1) 

 Harper complains about the following statement by the prosecutor during the last comments
made in his closing argument: 

 Now, Mr. Kamras worked real hard, real hard, ladies and gentlemen, to cast
Mr. Harper, at the end of his argument, as an ordinary man. I say to you, let's do
what needs to be done. Let's find Mr. Harper guilty of sexual assault as you should
find, then let's move to the next stage and see how ordinary a man he is.


 Counsel immediately went before the bench and objected to the last sentence of this
statement. He did not specify the grounds for his objection, which the court overruled. Counsel then
asked for a mistrial. That request was denied. 

 Harper contends on appeal that the trial court erred by overruling his objection because the
prosecutor clearly and improperly implied that he knew Harper was certainly not "ordinary" and that
he knew bad things about Harper that would be revealed at the next stage of the proceeding. Harper
argues that such an implication may not be made because it effectively places unsworn (and
unrebuttable) testimony before the jury. Although Harper's categorization might be inferred from
the argument, it is not apparent that this general statement would necessarily be apparent to the
jurors. We do not approve of prosecutorial comments that raise such an implication before the jury,
but we are also not entirely convinced that these statements suggest, with any degree of clarity, the
conclusion suggested by Harper.

 A proper jury argument must fall within one of four general areas: (1) summation of the
evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel;
and (4) plea for law enforcement. Guidry v. State, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999). Error
exists when facts not supported by the record are interjected in the argument, but in many instances
an instruction to the jury to disregard improper argument is sufficient to cure the error. See Moore
v. State, 999 S.W.2d 385, 405-06 (Tex. Crim. App. 1999); Kinnamon v. State, 791 S.W.2d 84, 89
(Tex. Crim. App. 1990). 

 In the present case, we are confronted with two hurdles which must be overcome in order to
reach the merits. First, the objection was not specific. Although counsel directed the objection at
a particular statement, he did not state in any respect the nature of his objection. In such a situation,
we must conclude that the claim of error was not preserved for review.

 In addition, counsel did not request that the court instruct the jury to disregard the improper
statement. The general rule for presenting a complaint for appellate review is a showing in the
record (1) that the complaint was made to the trial court by a request, objection, or motion that was
timely and sufficiently specific to make the trial court aware of the grounds of complaint and (2) that
the trial court ruled adversely (or refused to rule, despite objection). Tucker v. State, 990 S.W.2d
261, 262 (Tex. Crim. App. 1999). To reach the level of an adverse ruling, if the objection is
sustained, counsel must then ask for an instruction to disregard. If the instruction is given, counsel
must then move for a mistrial. Nethery v. State, 692 S.W.2d 686, 701 (Tex. Crim. App. 1985). 

 As previously stated, in most instances an instruction to disregard is considered to cure error,
and this is not such a blatant impropriety for us to conclude that an instruction would have been
ineffectual. 

 The contention of error is overruled.


 The judgment is affirmed.




 Ben Z. Grant

 Justice


Date Submitted: December 26, 2001

Date Decided: January 24, 2002


Do Not Publish
1. The prosecution against Workins was disposed of through a plea bargaining agreement. He
pleaded guilty to indecency with a child and received ten years' deferred adjudication.



one, and writing to different companies in order to clear up her credit and to
keep companies from filing charges against her for purchases she did not make. This
has caused her a lot of stress and still wonders what the defendant is going to do with
her checkbook and Driver's License. Mrs. Cerquera believes this defendant will
continue to commit fraud if given probation. She does not feel comfortable for
Mr. Duncan to be granted probation. This victim reported she remembers the
defendant very well and stated that defendant seemed to be a convincingly smart and
intelligent young man whom [sic] seems to be wasting his life. 

 

 . . . .

 Kim Huynh is the salesperson that sold Mr. Duncan a men's bracelet and women's
earrings for a total of $2466.26. Mr. Duncan walked into Zales Jewelry store and
obtained credit to buy the items under the name of Darris Johnson. The men's
bracelet recovered from Mr. Duncan's vehicle was in a Zales box. Ms. Huynh
request [sic] the Court allow a representative of her company to inspect the recovered
men's bracelet in the Zales box to see if this is the item taken from Zales. The
jewelry is listed as located at the HPD property room under case #136342100H. 
Ms. Huynh wants the Court to know that she does not feel comfortable with the
defendant being granted probation. 

 

 . . . .

 

 Darris Johnson is the victim whose name was used to obtain credit at several places
including the Ex-Imports Motorcycle Dealership. Mr. Johnson is a student at College
Station. He reported he has been too stressed out over what Mr. Duncan did to him. 
Mr. Johnson reported his studies have suffered and his grades have dropped due to
the pressure of having to clear his name by taking time from school to deal with
creditors looking to get paid for Mr. Duncan's fraud. Mr. Johnson reported he has
spent about $75.00 in Notary fees along with time needed and is still spending time
to rectify the situation. Mr. Johnson wants the Court to know he is severely opposed
to Mr. Duncan receiving probation. 

 

(Emphasis added.)

 Tex. Code Crim. Proc. Ann. art. 42.03, § 1(b) (Vernon Supp. 2002) (2) permits a victim, close
relative of a deceased victim, or guardian of a victim to appear in person and present to the court and
to the defendant a statement of the person's views about the offense, the defendant, and the effect of
the offense on the victim. The article provides, however, that this statement may not be made until
after the assessment of punishment, after the court has determined whether to grant community
supervision, after announcement of the terms and conditions of the sentence, and after sentence is
pronounced. Tex. Code Crim. Proc. Ann. art. 42.03, § 1(b)(1), (2), and (3). Duncan further argues
that these specific limitations on victims' statements prevail over the general language of Tex. Code
Crim. Proc. Ann. art. 42.12, § 9(a) (Vernon Supp. 2002), which authorizes the preparation of a PSI
report for the trial court "on the circumstances of the offense with which the defendant is charged,
the amount of restitution necessary to adequately compensate a victim of the offense, the criminal
and social history of the defendant, and any other information relating to the defendant or the offense
requested by the judge." (Emphasis added.) Duncan further cites Sattiewhite v. State, 786 S.W.2d
271 (Tex. Crim. App. 1989). In that appeal, the appellant challenged the ruling of the trial court's
refusing to permit a mental health expert to testify as to what punishment, death or mandatory life
imprisonment, would be most appropriate for the appellant. The Texas Court of Criminal Appeals
affirmed the trial court's ruling, holding "[t]he argument that a witness may recommend a particular
punishment to the trier of fact has been soundly rejected" concluded that such testimony would
escalate into a "battle of the experts." Id. at 290. The court in Sattiewhite cited Schulz v. State, 446
S.W.2d 872 (Tex. Crim. App. 1969), which affirmed the trial court's refusal to permit a psychiatrist
to give opinion testimony that it would be better for the appellant to be placed on probation than to
serve time in prison. The court held that permitting such testimony would invade the province of
the jury. Id. at 874. 

 This issue was considered by the Fort Worth Court of Appeals in Fryer v. State, 993 S.W.2d
385 (Tex. App.-Fort Worth 1999). The court held that in Article 42.03, the discussion of the
"testimony" of a victim does not include the information contained in the PSI report. Further, the
Fort Worth court cited Article 42.12, § 9(a), which contains broad language permitting the PSI report
to contain "any other information relating to the defendant or the offense." Fryer, 993 S.W.2d at
388. 

 At the time of Duncan' briefing, the Texas Court of Criminal Appeals had granted petition
for discretionary review in Fryer. The court has now ruled on the petition, affirming the decision
of the Fort Worth court. Fryer v. State, 68 S.W.3d 628 (Tex. Crim. App. 2002). The Texas Court
of Criminal Appeals's opinion in Fryer mentions the above-noted broad language of Article 42.12,
§ 9(a) with reference to information contained in the PSI report. Id. at 630-31. It distinguishes
Sattiewhite as being limited to expert testimony regarding punishment and further holds that the case
was limited to testimony and the information contained in the PSI report regarding the victim's
recommendation on whether to grant community supervision did not constitute testimony. Id. at
631-32. 

 As the Texas Court of Criminal Appeals in Fryer has ruled that a PSI report may properly
contain the victim's recommendation as to whether to grant community supervision, we follow the
court's determination. This issue is overruled.

Failure of Counsel to Object to Errors Referenced in

Duncan's Involvement in a "Pyramid Scheme"


 Duncan also contends trial counsel was ineffective at the punishment stage because he failed
to properly object to the "prosecutor's unfair manipulation of the Appellant's testimony [that] implied
an extraneous offense that had not been shown beyond a reasonable doubt to have been committed
by the Appellant." He argues that the prosecutor's questions attempted to show he was involved in
some kind of illegal pyramid scheme and, because this offense was not shown beyond a reasonable
doubt, it could not therefore be considered by the trial court at the punishment stage. Duncan argues
the trial court must have considered this because he was assessed the maximum punishment of two
years' confinement in a state jail facility.

 At the punishment stage, Duncan testified on direct examination he worked for Prepaid Legal
Services. On cross-examination, the first question the prosecutor asked him concerned the nature
of Prepaid Legal Services. Duncan answered it was "like a triangular type thing," and the prosecutor
continued as follows:

 Q. Like a pyramid scheme?

 

 A. Correct. It's -- like they sell like legal insurance for like lawyers or
something like that.

 

 Q. Okay. What do you mean? You sell something?

 

 A. Well, I -- if I was to go out into the community and speak to someone
about prepaid legal services, I would tell them about the company and I would bring
them into a meeting. All our meetings are held on Tuesdays. And I would bring
them into the meeting and --

 

 Q. Is this what you do, or you would do?

 

 A. That's what I do.

 

 Q. Okay. What do you sell them? Tell the Judge what you are selling
these people. 

 A. Selling them -- it's insurance to have like a legal shield type insurance. 
If they were to get into any trouble and they don't have a lawyer --

 

 THE COURT: Did you sell yourself any?

 

 THE DEFENDANT: No, sir. No, sir, I didn't receive any.

 

 Q. [by the prosecutor] And why is that?

 

 A. Because of -- the simple fact that it was something that I could just do
-- it was flexible and it would bring in an income.

 

 Q. What's a pyramid scheme?

 

 A. Well, I don't really -- I don't know if it's called a pyramid scheme or
if it's called a pyramid.

 A pyramid scheme sounds to me is something that's getting over on
someone. And that's not what the company does. 

 

The prosecutor continued, several pages later:

 Q. All right. Thank you. Prepaid Legal Services, you're telling us it's a
pyramid scheme. Is it a legal pyramid scheme?

 

 A. Ma'am.

 

 Q. What are you actually selling?

 

 A. It's legal insurance.

 

 Q. Who are the lawyers?

 

 A. They have their own group of lawyers.

 

 . . . .

 

 Q. So, when you're talking about a pyramid scheme, doesn't that mean
that the people who are in it at the beginning make a whole lot of money and the
people at the end don't make any money, . . . ?

 

 A. No, that's not correct.

 

 Q. Well, that's what this is -- how is this one different?

 

 A. Because when the people come in they have the opportunity to join
into the Prepaid Legal Services. They don't just have to buy or -- to have themselves
a lawyer; they can also join into where they're selling insurance also and make the
same amount of money that everyone else is making.

 

 The prosecutor continued in her summation:

 And this is a fraud case, and which he's admitted to being a member of a pyramid
scheme.

 

 . . . .

 

 And the fact that he's working and continues to work at a place that he himself
describes as some type of pyramid setup, where people who get in at the beginning
get paid a lot and if you don't get in until the end you don't get paid as much.

 

 Besides mischaracterizing Duncan's testimony, it is clear the prosecutor made no serious
attempt to get at the true nature of the operation by which Duncan was employed, Prepaid Legal
Services, to attempt to show, by facts and not "sound bites," that it was an illegal operation. See
Tex. Bus. & Com. Code Ann. § 17.461 (Vernon 2002). Her obvious purpose was to attach the label
"pyramid scheme" to Duncan. 

 The prosecutor has demonstrated through her questioning neither that the Prepaid Legal
Services (3) program was an illegal pyramid scheme nor that Duncan admitted being a member of an
illegal pyramid scheme. In fact, he specifically disputed the prosecutor's characterization of his
employer as an illegal operation. Duncan's counsel did make some attempt to point out that the
prosecutor had mischaracterized Duncan's testimony, but counsel did not object to the prosecutor's
manipulation of testimony until the testimony was repeated several times. However, no explanation
of trial counsel's reasoning or possible strategy appears in the record of this case. Any claim of
ineffective assistance is required to be "firmly founded" in the record. Thompson v. State, 9 S.W.3d
808, 813 (Tex. Crim. App. 1999). 

 As far as strategic or tactical reasons for counsel's action or inaction, in the absence of direct
evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic
motivation, if any can be imagined. Garcia v. State, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). 
We will not conclude that the challenged conduct constitutes deficient performance unless the
conduct was so outrageous that no competent attorney would have engaged in it. Id.; see Thompson,
9 S.W.3d at 814. In Osorio v. State, 994 S.W.2d 249 (Tex. App.-Houston [14th Dist.] 1999, pet.
ref'd), the Fourteenth Court of Appeals held that, notwithstanding the prosecutor's blatant injection
of erroneous and derogatory remarks about "Columbian cocaine" into the proceedings, called by the
concurring opinion "needless prosecutorial misconduct," Id. at 253-54, the appellant's claim that his
counsel was ineffective for failure to object could not be sustained because there was no evidence
in the record as to trial counsel's reasoning for failure to object. The court held that with nothing in
the record, the appellant had failed to overcome the recognized presumption that counsel's actions
(or, in this case, inactions) were based on sound trial strategy.  Id. at 253.

 Direct appeals often present a limited record for review of the typical issues raised in an
ineffective assistance point. Thompson, 9 S.W.3d at 812. One way to present evidence of counsel's
trial strategy or other matters in the direct appeal record is through a motion for new trial. See
Motley v. State, 773 S.W.2d 283, 290 (Tex. Crim. App. 1989) (evidence relating to counsel's trial
strategy appeared in the record because a motion for new trial was held on the issue of counsel's
ineffective assistance). Another way to develop a proper record is through a hearing in a habeas
corpus collateral attack. See generally Tex. Code Crim. Proc. Ann. art. 11.01, et seq. (Vernon
1977 & Supp. 2002). 

 The Texas Court of Criminal Appeals has recognized that a reviewing court will only rarely
be provided with a record capable of providing a fair evaluation of the merits of a claim of
ineffective assistance. Thompson, 9 S.W.3d at 813; Jackson v. State, 973 S.W.2d 954, 957 (Tex.
Crim. App. 1998). To defeat the presumption of reasonable professional assistance, "[a]ny allegation
of ineffectiveness must be firmly founded in the record and the record must affirmatively
demonstrate the alleged ineffectiveness." McFarland v. State, 928 S.W.2d 482, 500 (Tex. Crim.
App. 1996). 

 When direct appeal does not provide an adequate record to evaluate a claim which might be
substantiated through additional evidence gathered in a habeas corpus proceeding, a claim of
ineffective assistance of counsel will properly be raised through habeas corpus, even if it had been
previously rejected on direct appeal. Ex parte Duffy, 607 S.W.2d 507, 513 (Tex. Crim. App. 1980),
quoted by Oldham v. State, 977 S.W.2d 354, 363 (Tex. Crim. App. 1998); see also Jackson, 973
S.W.2d at 957; Ex parte Torres, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).

 The record in the present case is silent as to trial counsel's strategy. The State contends there
is a conceivable trial strategy, i.e., counsel intended to allow Duncan to explain his answers
regarding the "pyramid scheme." We also observe that because the matter was tried to the court and
not a jury, counsel may have assumed the trial court was aware of the statute authorizing prepaid
legal services (Article 5.13-1 of the Texas Insurance Code) and recognized that the elements of the
"pyramid scheme," contained in Section 17.461 of the Texas Business and Commerce Code is
defined as having certain prerequisites that were not shown in evidence to exist in the program in
which Duncan had participated. We are required, therefore, to hold that Duncan has not met his
burden to overcome the presumption of professional assistance and sound trial strategy. This point
of error is overruled. 


 The judgment of the trial court is affirmed.




 Ben Z. Grant

 Justice


Date Submitted: May 30, 2002

Date Decided: August 8, 2002


Publish
1. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
2. All references hereafter are to the Texas Code of Criminal Procedure, unless otherwise
specified. 
3. Prepaid Legal Services contracts were authorized by Article 5.13-1 of the Texas Insurance
Code, which was initially passed in 1975.